**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**ALAN M. JOHNSON,**

**Petitioner,**

**v.** **Case No. 25-CV-1449-SCD**

**CHRIS BUESGEN,**

**Respondent.**

---

# DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

---

No one doubts that Alan Johnson killed a victim, herein known as K.M. Under cover of night, dressed in black and armed with a handgun, Johnson slipped into K.M.'s home in search of something. Johnson says he was searching for evidence of child pornography. Two hours later, K.M. discovered him, and Johnson shot K.M. five times. Johnson's prosecution unfolded across two trials, with the second following the reversal of his first. Johnson's first jury acquitted him of intentional homicide. He argues that, at his second trial, the court improperly asked the second jury to find that he intended to kill K.M. after the first jury found that he did not. The question is whether the first jury necessarily decided Johnson's intent—and, if so, whether the Constitution's Double Jeopardy Clause barred the State from asking the second jury to decide it again.

## BACKGROUND

Johnson entered K.M.'s home late in the evening in October 2016. Johnson testified that he came to search K.M.'s computer for evidence of child pornography. He brought a loaded handgun, which he said was for protection. *See* ECF No. 9-25 at 128. Several hours

later, K.M. entered the computer room where Johnson was. What happened next is less clear. What is clear is that Johnson shot K.M. five times, killing him. Investigators soon focused on Johnson. He confessed shortly after. *See* ECF No. 9-16 at 30.

## I. Trial One

The State charged Johnson with first-degree intentional homicide and armed burglary. *See* ECF No. 9-30 at 3. The jury also considered the lesser-included offenses of second-degree intentional homicide and first-degree reckless homicide. Counsel focused the jury's attention on Johnson's intent from the start: "The issue in this case is not who did it. The issue is intent." *See* ECF No. 9-2 at 48.

The State's closing argument challenged Johnson's explanation for entering K.M.'s home. The State argued that Johnson "wanted the very confrontation that happened." *See* ECF No. 9-10 at 75–77. The prosecution argued Johnson could have escaped or hidden when he heard K.M. approaching. *Id.* Instead, the State says he remained in the room, armed and waiting, after he had finished searching the computer. *See id.* at 91. The State urged the jury to infer that Johnson's real purpose was not to gather evidence but to confront and kill K.M.

For his part, Johnson's counsel argued that the case was about Johnson's intent: "the specific intent to kill," not "to stave off [an attack], to wound, to threaten." *See* ECF No. 9-10 at 145–46. Counsel argued that Johnson entered K.M.'s home to gather evidence, not to kill. *See* ECF No. 9-2 at 57–61. Johnson had described a history of abuse by K.M., including sexual abuse and assaults on other occasions. *See* ECF No. 9-10 at 169. According to Johnson, that history justified why he feared K.M. and thus took a gun for protection.

Intent was not the only issue, though. The instructions required the jury to consider Johnson's beliefs about the need to use deadly force and whether he provoked K.M. The

court's instructions differentiated between the three homicide offenses and explained how self-defense and provocation might affect the jury's decision:

*First-Degree Intentional Homicide*. The court broke down the charge of first-degree intentional homicide into three elements. First, Johnson must have caused the death of K.M. Second, Johnson must have intended to kill K.M. Third, Johnson did not actually believe that the force he used was necessary to prevent imminent death or great bodily harm to himself. The court instructed the jury to consider first-degree intentional homicide first and to reach second-degree intentional homicide only if "not so satisfied" beyond a reasonable doubt. *See* ECF No. 9-10 at 47–50.

*Second-Degree Intentional Homicide.* For second-degree intentional homicide, the State had to prove the same first two elements. It also had to prove that Johnson did not reasonably believe he faced an unlawful threat or that deadly force was necessary to protect himself from imminent death or great bodily harm. The two intentional homicide offenses differ mainly in how they treat Johnson's belief that force was necessary to prevent imminent death or great bodily harm. First degree required the State to prove Johnson did not actually hold that belief. Second degree required the State to prove only that he did not *reasonably* hold it. *See* ECF No. 9-10 at 51–54.

*First-Degree Reckless Homicide.* The State had to prove three elements. First, Johnson caused the death of K.M. Second, the defendant caused the death by "criminally reckless conduct." Third, the defendant must have shown "utter disregard for human life." The judge instructed the jury to consider self-defense as part of the second and third elements. The State had to prove beyond a reasonable doubt that the defendant did not act lawfully in self-defense. The court explained that "[i]f the defendant was acting lawfully in self-defense, his conduct

did not create an unreasonable risk to another." So, self-defense was part of proving recklessness. *See* ECF No. 9-10 at 54–57.

*Provocation Instruction.* The court also told the jury to consider whether the defendant provoked the attack. The judge explained that a person who provokes an attack through conduct "of a type likely to provoke others to attack" may not use self-defense against that attack. ECF No. 9-10 at 46–47. The State invoked this instruction in closing, arguing that Johnson provoked the attack. Johnson, by contrast, claimed that he feared K.M. and believed deadly force was necessary to protect himself.

The jury found Johnson guilty of first-degree reckless homicide and not guilty of burglary. *See* ECF No. 9-11 at 3–4. By convicting Johnson of reckless homicide rather than either intentional homicide offense, the jury also implicitly acquitted him of first- and second-degree intentional homicide.

Johnson secured a new trial on appeal. The Wisconsin Supreme Court held that the trial court erred by refusing to instruct the jury on perfect self-defense and second-degree reckless homicide. *State v. Johnson*, 961 N.W.2d 18, 30 (Wis. 2021). The parties agreed that, due to the (implicit) acquittals on those counts, the State could not retry Johnson of either intentional homicide or burglary. *See id.* at 30 n.20.

## II. Trial Two

The State did retry Johnson for reckless homicide. *See* ECF No. 9-27 at 11, 24–25. Before trial, the parties disputed whether the court should give the jury an additional provocation instruction. *See* ECF No. 9-17 at 25–37. That paragraph addressed whether a defendant who intentionally provokes an attack as an excuse to cause death or great bodily

harm loses the privilege of self-defense.[1] Johnson objected that the instruction would permit the jury to reconsider an issue the first jury had already resolved through its acquittals in violation of the Double Jeopardy Clause. *Id.* The judge disagreed and allowed the instruction. *See* ECF No. 9-26 at 104–05.

The second trial focused primarily on Johnson's recklessness and whether he acted in lawful self-defense. Johnson's counsel opened and closed the second trial by stating that this was a "self-defense case." *See* ECF Nos. 9-20 at 38–49; 9-27, at 40. The State, similarly, opened by arguing that the case involved an utter disregard for human life. *See* ECF No. 9-20 at 17–18. It argued that Johnson created an unreasonable danger by entering K.M.'s home at night with a loaded handgun and remaining there for hours. *See* ECF No. 9-27 at 29. The State also challenged Johnson's claim of self-defense on several grounds. It argued that K.M. was naked, unarmed, and lawfully protecting himself against an armed intruder. *Id.* at 33. Even if Johnson believed K.M. posed a threat, the State argued that belief was unreasonable. *Id.* at 37. It maintained Johnson had no reason to think deadly force was necessary. *Id.* at 35. It also argued that Johnson could have avoided the situation altogether by identifying himself or attempting to escape. *Id.* at 37–38.

Besides self-defense, the State also arguably raised Johnson's intent to provoke an attack. On cross-examination, the State asked Johnson whether he "wanted to have the ability to kill someone" when he entered the house. *See* ECF No. 9-25 at 127. And in closing, the prosecutor argued that Johnson used "this situation with intent to use any attack against him as an excuse to cause death or great bodily harm." *See* ECF No. 9-27 at 39. In short, the State

[1] "A person who provokes an attack whether by lawful or unlawful conduct with intent to use such an attack as an excuse to cause death or great bodily harm to another person is not entitled to use or threaten force in self-defense." *See* Wis. JI—Criminal 815 (2020); Wis. Stat. 939.48(2)(c).

principally challenged the reasonableness of Johnson's conduct and his claim of self-defense. But it also asked the jury to consider whether he intentionally provoked the confrontation as an excuse to use deadly force.

The court first instructed the jury on first-degree reckless homicide, using instructions similar to those in Johnson's first trial. The State had to prove Johnson caused K.M.'s death by criminally reckless conduct, showing an utter disregard for human life. *See* ECF No. 9-27 at 11–13. The judge also instructed the jury on second-degree reckless homicide, which mirrors first-degree except that it does not require an utter disregard for human life. *Id.* at 16.

The judge also explained that Johnson could only use deadly force if he reasonably believed that it was necessary to prevent imminent death or great bodily harm. *Id.* at 9. The judge instructed the jury on provocation: a person who provoked an attack through unlawful conduct generally loses the privilege of self-defense against the attack. *See* ECF No. 9-27 at 13–15.

The provocation instruction also contained the disputed paragraph on intentional provocation:

> A person who provokes an attack, whether by lawful or unlawful conduct, with intent to use an attack, to use such an attack as an excuse to cause death or great bodily harm to another person is not entitled to use or threaten force in self-defense.

*See* ECF No. 9-27 at 13–15. The judge concluded by instructing the jury that the State had to disprove lawful self-defense beyond a reasonable doubt to convict Johnson of either reckless homicide offense. *Id.* at 15–16. The jury convicted Johnson of second-degree reckless homicide. *See* ECF No. 9-28 at 3.

Johnson challenged the provocation instruction on appeal, but the Wisconsin Court of Appeals rejected his double jeopardy claim. *State v. Johnson*, No. 2023AP2272-CR, 2025

WL 409775, at *7 (Wis. Ct. App. Feb. 5, 2025) (per curiam). It held that the Double Jeopardy Clause applies when a defendant is charged again for a crime for which he was previously charged and either acquitted or convicted. *Id.* at *6–8. Because the first jury acquitted Johnson of intentional homicide and then the State charged him with reckless homicide, he was never put in "jeopardy" twice as understood by the Fifth Amendment. *Id.* He appealed to the Wisconsin Supreme Court, which denied review. *State v. Johnson*, 27 N.W.3d 796 (Wis. 2025). This habeas petition followed.

## DISCUSSION

Johnson argues that his second trial violated the Double Jeopardy Clause of the Fifth Amendment, relying on *Ashe v. Swenson*, 397 U.S. 436 (1970). His argument has four moves. First, Johnson argues that the first jury necessarily found he did not intend to kill K.M. He points to the jury's acquittals on intentional homicide, and its conviction for reckless homicide. He also relies on the State's first trial theory that Johnson went to K.M.'s home intending to shoot him. Together, these show that the first jury decided that Johnson did not intend to kill K.M. Second, Johnson argues, the State could not relitigate the intent-to-kill issue the first jury decided. Third, the judge told the second jury that Johnson had no right to self-defense if he intentionally provoked an attack as an excuse to shoot K.M. Fourth, he contends, that instruction required the second jury to decide the same intent issue the first jury had already resolved. That, he says, violated the Double Jeopardy Clause.

## LEGAL STANDARD

Habeas corpus has long protected individual liberty against unlawful detention. *Harris v. Nelson*, 394 U.S. 286, 290–91 (1969). Both federalism and the interest of finality place habeas on a narrow footing. *See Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993); *Calderon v.*

*Thompson*, 523 U.S. 538, 555 (1998) (collecting cases). Congress protected that balance in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which limits relief for convictions in state court. *See* 28 U.S.C. § 2254(d). Relevant here, a federal court may not grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). If the petitioner clears that bar, the court reviews the claim *de novo*. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even then, a court grants the writ only if "law and justice require" it. 28 U.S.C. § 2243; *Brown v. Davenport*, 596 U.S. 118, 134 (2022).

## ANALYSIS

Johnson's petition presents three questions: (1) whether any state court adjudicated his *Ashe* claim, and if so, which; (2) if any did, whether the decision was contrary to or an unreasonable application of clearly established federal law; and (3) if § 2254(d) does not bar relief, whether the second trial violated the Double Jeopardy Clause.

### I. The Wisconsin Court of Appeals' Decision Receives AEDPA Deference

The first question under AEDPA is whether the state courts adjudicated Johnson's federal claim on the merits. When a state court decides a federal claim on the merits, AEDPA generally requires a federal court to defer to that decision. 28 U.S.C. § 2254(d). That inquiry has two parts. The court must determine whether the state courts reached the merits of Johnson's double jeopardy claim and then identify which decision supplies the relevant rationale for federal habeas review.

Neither party seriously disputes that *a* state court adjudicated Johnson's double-jeopardy claim on the merits. A claim is adjudicated on the merits when a decision resolves

the parties' claims "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *McMullen v. Dalton*, 83 F.4th 634, 642 (7th Cir. 2023) (citation modified). Here, the Wisconsin Court of Appeals and the circuit court both rejected Johnson's double-jeopardy challenge on its merits.

The court of appeals did not cite or discuss *Ashe*, but that omission does not necessarily change the conclusion. *See Riley v. Calloway*, 882 F.3d 738, 744 (7th Cir. 2018). Nothing suggests oversight here. The court did address double jeopardy. It held that the Clause was not violated because Johnson was not retried for the offenses of which he was acquitted. That offense-focused reasoning is a substantive answer to Johnson's *Ashe* argument, whatever its merits. *Cf. Currier v. Virginia*, 585 U.S. 493, 503–04 (2018) (plurality opinion).

The second part of the inquiry asks which state court supplies the relevant rationale for federal habeas review. Courts look to the last "related state-court decision that . . . provide[s] a relevant rationale." *McMullen*, 83 F.4th at 641 (quoting *Wilson v. Sellers*, 584 U.S. 122 (2018)). When that "last" court denies review without explanation, courts generally "look through" that denial and presume it adopts the lower court's reasoning. *See Wilson*, 584 U.S. at 125–26; *see, e.g.*, *Wilson v. Cromwell*, 69 F.4th 410, 418 n.7 (7th Cir. 2023) (looking through the Wisconsin Supreme Court's unexplained denial of review to the Wisconsin Court of Appeals' decision). In fact, this is how almost every habeas case is decided at the federal level, given that state supreme courts rarely grant review.

But not always. The State may "rebut the presumption [of "looking through"] by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Wilson*, 584 U.S. at 125–26. Here, the State asks this court to find that the cursory denial of review issued by the state supreme court is itself the

decision under federal habeas review. The state offers two reasons for this somewhat unusual suggestion:

1) Johnson told the Wisconsin Supreme Court that the court of appeals failed to properly apply (or even address) his *Ashe* claim.
2) The State "persuasively" explained that the alleged *Ashe* error did not matter because Johnson's claim failed under *Ashe.*

The State relies on *Wilson's* recognition that "convincing alternative arguments for affirmance" presented to the state's highest court may provide evidence sufficient to rebut the look-through presumption. 584 U.S. at 132. But the existence of such arguments is only a starting point. The State still must show that the higher court most likely relied "on a different ground than the lower state court." *Id. Wilson* points to two kinds of evidence that can carry that burden. The State offers neither.

First, *Wilson* explained that a litigant is more likely to overcome the presumption when the lower court's decision was unreasonable. 584 U.S. at 125–26. As explained below, although the court of appeals did not refer to *Ashe*, its decision was neither contrary to nor an unreasonable application of federal law.[2]

Second, parties generally overcome the presumption with strong evidence that the higher court most likely relied on a different ground. The Supreme Court identified several examples. One involves a retroactive change in law eliminating the lower court's rationale, coupled with the higher court's decision to order briefing on an alternative ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). Other procedural circumstances may also strongly

[2] *See Shinn v. Kayer*, 592 U.S. 111, 120 n.1 (2020) (per curiam) (declining to consider whether the higher court's unexplained decision rested on different grounds because the lower court had not unreasonably applied federal law).

suggest the higher court could not or likely did not adopt the lower court's reasoning. *See Wilson*, 584 U.S. at 132.

But these divergences from the traditional approach are few and far between. That's because divining something meaningful from a court's silent affirmance is a tea-leaf reading exercise fraught with peril. After all, the state supreme court is composed of seven justices, each of whom possibly harbored a different view of the correct legal reasoning. That they said nothing, in effect, *could* mean that they are in full agreement with the court of appeals. But, for all we know, the justices could have circulated a half-dozen draft opinions and then simply chosen a one-word affirmance because they could not reach consensus. To draw any kind of substantive inference from this—to put words in the court's mouth, in effect—would offend that court's decision to remain silent and would require this court to "imagine what might have been the state court's supportive reasoning." There is little reason to do that, and many reasons *not* to do that, when the state courts have explicitly provided their reasoning in the body of the court of appeals' opinion. *Wilson,* 584 U.S. at 130.

In short, because the State did not rebut the look-through presumption, the court will look through the Wisconsin Supreme Court's unexplained denial of review to the Wisconsin Court of Appeals' decision.

## II. *Ashe* is clearly established law and is not limited to successive prosecutions for the same offense

After identifying the relevant court's explanation, the question now is whether the Wisconsin Court of Appeals "unreasonably applied 'clearly established Federal law, as determined by' [the Supreme Court]." *Andrew v. White*, 604 U.S. 86, 92 (2025) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)). Answering it takes two steps: deciding whether *Ashe* clearly establishes the rule Johnson relies on and then asking whether the court of appeals' decision

was contrary to or unreasonably applied that rule. The first step begins and ends with the Supreme Court's holdings. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (clearly established law "refers to the holdings, as opposed to the dicta, of this Court's decisions"). Holdings are not limited to the specific facts of the case. They may also include "a legal rule or principle" when the Court relies on it to decide a case. *See Andrew*, 604 U.S. at 92, 94. Yet courts should not read holdings at so "high [a] level of generality" as to avoid "transform[ing] even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'" *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (quoting 28 U.S.C. § 2254(d)(1)).

*Andrew* illustrates why courts must identify the governing holding without confining it to the particular facts of the case. Last year, the Supreme Court vacated a Tenth Circuit decision because it had construed Supreme Court precedent too narrowly when identifying clearly established law. 604 U.S. at 91, 96. A principle does not cease to be clearly established merely because the Supreme Court has not applied it to the particular facts of the case. *Id.* at 94. The question is whether the asserted rule follows from the Court's holdings or would require extending them. *See White v. Woodall*, 572 U.S. 415 (2014).

*Andrew* thus points courts to find governing principles, not factual twins. Here, the court asks whether the rule established in *Ashe* and its progeny applies to the intent-to-provoke paragraph. Johnson relies on *Ashe* to establish that "the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." Pet'r's Br. at 12 (quoting *Yeager v. United States*, 557 U.S. 110, 119 (2009)). The State acknowledges *Ashe's* general rule. But it argues that the Supreme Court has applied it only to bar the government "from prosecuting the defendant for a particular offense." Resp't's

Br. at 11 (citing *Ashe*, 397 U.S. at 445). The State also argues that no Supreme Court decision has applied *Ashe* to preclude using part of a jury instruction for an affirmative defense. In the State's view, that gap is fatal because no Supreme Court case has extended *Ashe* this far.

Resolving their disagreement entails understanding how *Ashe's* issue-preclusion rule fits within the Double Jeopardy Clause. The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. That bar has a well-established pedigree.[3] Yet the Supreme Court in *Ashe* has also recognized a concept closely related to the bar against being tried for the same crime twice—the prohibition against retrying a defendant on factual issues necessarily decided in his first trial. *See Ashe*, 397 U.S. at 445–46.

In *Ashe*, the defendant was acquitted of robbing one of six men at a poker game. No one disputed that the robbery had occurred or that the robbers took items from the victims. The only question for the jury was whether the defendant was one of the robbers. *Id.* at 445. After hearing "weak" evidence identifying the defendant as one of the robbers, the jury acquitted him. *Id.* at 438–40. Undeterred, the prosecution charged the defendant again, this time with robbing another of the six poker players during the same holdup. This time, a jury found him guilty of robbing the second victim. But that second conviction rested on a question the first jury had already answered in the defendant's favor: was the defendant one of the robbers? *Id.* at 445. The Supreme Court held that collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443. In *Ashe,*

[3] *See* 4 *William Blackstone, Commentaries* 335 ("FIRST, the plea of *auterfoits acquit*, or a former acquittal, is grounded on this universal maxim of the common law of England, that no man is to be brought into jeopardy of his life, more than once, for the same offense.").

the first jury had already decided that the State failed to prove defendant was one of the robbers. The State could not ask a second jury to decide otherwise.

The Supreme Court has repeatedly confirmed *Ashe's* constitutional "principle." *See Dowling v. United States*, 493 U.S. 342, 348 (1990) ("A second prosecution was impermissible because, to have convicted the defendant in the second trial, the second jury had to have reached a directly contrary conclusion.") (citing *Ashe*, 397 U.S. at 445); *Yeager*, 557 U.S. at 119–20. *Ashe* thus establishes that the Double Jeopardy Clause precludes the Government from relitigating an issue that was necessarily decided by a jury in a prior trial.

The State says no clearly established law governs here because the Supreme Court has never applied *Ashe* to a jury instruction on a complete defense. But the State's argument overlooks the role of self-defense under Wisconsin law. For a recklessness-based offense, lawful self-defense negates the element of criminal recklessness, which the State must prove beyond a reasonable doubt. *See Brown v. Eplett*, 48 F.4th 543, 554 (7th Cir. 2022). Indeed, the Seventh Circuit has observed that "the absence or disproof of self-defense could be equated with an element" of a reckless offense. *Id.* at 556. Similarly, the challenged jury instruction here permitted the jury to reject self-defense by finding that Johnson intentionally provoked an attack as an excuse to cause death or great bodily harm. While the State could disprove self-defense in several ways, Johnson argues that the first jury necessarily decided this factual issue in his favor.

I decline to adopt the State's contention that *Ashe* only bars the government from prosecuting the defendant for a particular *offense*. That reading is too narrow. *Ashe* applies when doing so requires the second jury to find a fact that necessarily contradicts a fact found by the first jury. *Dowling*, 493 U.S. at 347.

## III. The Wisconsin Court of Appeals' decision was not contrary to *Ashe*

Courts next ask whether the state-court decision was either "contrary to" or an "unreasonable application" of that law. 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to clearly established law if it applies a rule that contradicts the governing law set forth in Supreme Court cases. *Williams*, 529 U.S. at 405. Johnson argues that the court of appeals' decision was contrary to *Ashe* because the court never cited it and focused on whether Johnson was retried for the same offenses. But a state court need not cite *Ashe*, "so long as neither the reasoning nor the result of the state-court decision contradicts" it. *Early v. Packer*, 537 U.S. 3, 8 (2002).

It's true that the Wisconsin Court of Appeals did not cite or discuss *Ashe*. Instead, it held that the Double Jeopardy Clause prohibits successive prosecution for the same offense. And because Johnson was first acquitted of only intentional homicide, his later conviction of reckless homicide could not have offended the Fifth Amendment. Despite a lack of articulated reasoning, the court of appeals' reliance on the same-offense principle did not inherently conflict with *Ashe*.

*Ashe* did not recognize a constitutional protection wholly separate from the prohibition against successive prosecutions for the same offense. *Ashe*, 397 U.S. at 442. Rather, it recognized issue preclusion as one aspect of that guarantee. *Id.* Indeed, *Ashe* treated issue preclusion as "embodied in the . . . guarantee" of the Fifth Amendment. *Id.* The Supreme Court later explained that relitigating an issue necessarily resolved by an earlier acquittal may be "tantamount to the forbidden relitigation of the same offense." *Currier*, 585 U.S. at 499 (majority opinion).

The Wisconsin Court of Appeals relied on the same-offense principle, which is broad enough to encompass *Ashe's* issue-preclusion rule. The Wisconsin Court of Appeals certainly could have expanded its analysis. But a decision is not "contrary to" *Ashe* unless its "reasoning" or "result" contradicts it. *Early*, 537 U.S. at 8. The Court of Appeals' reliance on the same-offense principle does not, by itself, establish that its decision was contrary to clearly established law. And because the result—as shown below—does not contradict *Ashe*, I cannot say the decision is contrary to federal law. In any event, Johnson's claim fails even without deference to the state court. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## IV. Johnson's claim fails under a *de novo* review

*Ashe* bars the State from trying an issue that a prior acquittal necessarily decided. *Ashe*, 397 U.S. at 442. Applying that rule involves two questions. First, what did the jury necessarily decide at the first trial? *Currier*, 585 U.S. at 500 ("the Court must be able to say that it would have been irrational for the jury in the first trial to acquit without finding in the defendant's favor on a fact essential to a conviction in the second.") (cleaned up); *Schiro v. Farley*, 510 U.S. 222, 233 (1994). Second, at the second trial, must the State "prevail on an issue the jury necessarily resolved in the defendant's favor in the first trial"? *Currier*, 585 U.S. at 499; *see Ashe*, 397 U.S. at 445; *Dowling*, 493 U.S. at 348.

A court answers both by examining the record of each trial, "taking into account the pleadings, evidence, charge, and other relevant matter." *Ashe*, 397 U.S. at 444; *see also Schiro*, 510 U.S. at 233. Johnson bears the burden. *Bravo-Fernandez v. United States*, 580 U.S. 5, 12 (2016).

### A. The first jury did not necessarily decide that Johnson lacked intent to kill

It might be helpful at this stage to restate the petitioner's objection. In short, Johnson argues that allowing the second jury to consider provocation, which requires a finding of "*intent* to use such an attack as an excuse to cause death or great bodily harm to another person," violated double jeopardy because the first jury had acquitted him of the two counts that required a finding of intent to kill. In Johnson's view, the first jury necessarily found *no intent to kill,* by virtue of its acquittals on the intentional homicide counts. Then, in the second trial, the state was allowed to argue that Johnson had provoked the attack with the intent to use it as an excuse to kill K.M. or cause great bodily harm.

Johnson's central problem is the premise that the first jury necessarily decided he had no intent to kill. That's not true. Intent was just one element. The state needed to run the table and prove *all* elements beyond a reasonable doubt, so its failure on *any* element would force an acquittal. Specifically, for first- and second-degree intentional homicide, the state needed to prove that Johnson (1) caused the death of another; (2) intended to kill; and (3) lacked actual belief that force was necessary to prevent death or great bodily harm to oneself (first-degree intentional homicide) or lacked reasonable belief that force was necessary to prevent death or great bodily harm to oneself (second-degree intentional homicide). (For consistency, I repeat these element numbers below). The jury implicitly acquitted on these intentional homicide counts. Standing alone, those acquittals tell us only that the State failed to meet its burden of proof on *one* or more elements. We know that Johnson (1) caused the death, because he admitted it, so we can put that element to one side. But it's a crap shoot whether the jury acquitted Johnson of those charges because he (2) lacked intent to kill or (3) he lacked an actual belief (or had an unreasonable belief) that he needed to use force to prevent death or great bodily harm. The jurors could have found proof on both elements lacking, or just one.

We'll never know. And so, on their own, the acquittals on the intentional counts do not tell us whether the jury *necessarily* concluded anything at all about element (2) intent to kill.

Does the first jury's conviction for *reckless* homicide change the picture? Not really. A conviction for reckless homicide required the jury to find that Johnson (1) caused K.M.'s death; (2) through criminally reckless conduct; (3) while showing an utter disregard for human life; and (4) did not act lawfully in self-defense. *See* ECF No. 9-10 at 44. Because the jury convicted Johnson on this count, it must have found each element beyond a reasonable doubt. When the jury found he did not lawfully act in self-defense, it could have rested that conclusion on one of two grounds. First, it could have found that Johnson lacked an actual or reasonable belief that deadly force was necessary. In other words, perhaps Johnson did not believe he faced the kind of danger that required deadly force to prevent. Alternatively, the jury could have concluded that, even if he did believe he was in substantial danger, that danger arose only because he provoked K.M.'s attack. A provocation finding would preclude Johnson's ability to rely on self-defense. Either of these alternative conclusions would explain the jury's conviction for reckless homicide.

In sum, Johnson's premise that the first jury necessarily decided he lacked intent to kill does not hold up to scrutiny. The jury's verdict, therefore, did not preclude the judge at the second trial from instructing the jury on provocation.

**B. The second jury did not have to find intent to kill**

Even if Johnson were correct that the first jury *did* necessarily find no intent to kill, the court in the second case was not wrong to instruct the jury on provocation, even though provocation includes an intent component. *Ashe* bars a second trial only when it would require the factfinder to conclude something directly contrary to what the first jury found. 397 U.S.

at 445; *see Dowling*, 493 U.S. at 348 ("A second prosecution was impermissible because, to have convicted the defendant in the second trial, the second jury ***had*** to have reached a directly contrary conclusion.") (emphasis added); *Currier*, 585 U.S. at 499 ("*Ashe* forbids a second trial ***only if*** to secure a conviction the prosecution ***must prevail*** on an issue the jury necessarily resolved in the defendant's favor in the first trial.") (emphasis added); *Yeager*, 557 U.S. at 123 (acquittal bars prosecution "for any charge for which [the precluded issue] is an essential element"). The bar applies only to issues the State had to prove to convict.

In the second trial for reckless homicide, the jury never *had* to conclude Johnson intended to kill K.M. Reckless homicide charges required the jury to consider self-defense as an element, and the State had to disprove self-defense beyond a reasonable doubt. The judge gave the State several ways to disprove self-defense, and the State needed only one:

1) Johnson did not actually or reasonably believe there was an actual or imminent unlawful interference with his person.
2) Johnson did not actually or reasonably believe that deadly force was necessary to prevent imminent death or great bodily harm to himself.
3) Johnson engaged in unlawful conduct likely to provoke an attack and was not entitled to self-defense because he did not reasonably believe he had exhausted every other reasonable means to escape or avoid that harm.

The jury could reject self-defense through any of the routes above without finding that Johnson intended to kill K.M.

Johnson protests that the State's theory of the prosecution was that Johnson went to K.M.'s home knowing it would likely provoke a confrontation and then used that confrontation as an excuse to kill K.M. In support, Johnson cites several statements by the

prosecutor to support an intentional provocation theory. For example, "[Johnson] went over to that house, knowing that it would likely provoke a confrontation with [K.M.]." *See* ECF No. 9-27 at 57. Or "there was actions here that show that . . . [Johnson] did use this situation with intent to use any attack against him as an excuse to cause death or great bodily harm to [K.M.]." *See id.* at 39. Yet these statements do not tell the whole story or even most of the State's theory.

To start, provocation did not figure prominently in the second trial until the parties discussed jury instructions, shortly before closing arguments. As the prosecutor acknowledged near the end of the State's closing argument, "the first time [provocation] . . . really [came] up" was during the court's jury instructions. *See* ECF No. 9-27 at 35. This suggests that provocation was not the State's principal theory. Indeed, the State opened its closing argument by stating that because Johnson was charged with reckless homicide, the State did *not* "have to prove that he went into this house, intending to kill [K.M.] that night." *See id.* at 26. Thus, the State actually downplayed the importance of Johnson's intent to kill.

The State instead focused much of its argument on Johnson's dangerous conduct. The State said Johnson created a "powder keg situation." *See id.* at 28. It said Johnson brought a gun to a place K.M. frequented and stayed there for two hours. The State claimed such a situation could only end badly—a classic example of reckless conduct that showed an utter disregard for human life.

The State also challenged self-defense on grounds other than intent to kill. It argued that the only evidence relating to self-defense was Johnson's testimony that K.M. ran into the room. *Id.* at 33. The State contended self-defense applies only to unlawful interference with one's person. Because K.M. acted lawfully when he allegedly charged Johnson, the State said,

Johnson's self-defense claim failed on its face. *Id.* The State even disputed that K.M. attacked Johnson, citing the lack of physical evidence. *Id.* at 36. And even if K.M. did attack Johnson, the prosecution pointed out that Johnson had to reasonably believe he was in imminent danger of death or great bodily harm—not that someone might run into the room and tackle him. Running through alternatives, the State argued that, because Johnson provoked the attack (if there was one), he could use deadly force only if he first tried to exhaust means of escape. *Id.* at 37. The State noted he did not try to hide, push the door shut, or call out to two other people in the house.

Taken together, these arguments tend to show that the State's principal theory rested on Johnson's reckless conduct and the absence of lawful self-defense, rather than an intent to kill K.M., by means of provocation or otherwise. The State thus offered the jury several grounds for conviction that did not require it to find that Johnson intended to kill K.M. or that he deliberately provoked an attack as an excuse to do so.

Johnson also points to his cross-examination as proof that the State focused on his intent to kill. But some of those exchanges can also support the State's theories above. Consider several examples: "You wanted to have the ability to kill someone when you went in that house." *See* ECF No. 9-25 at 127. That question fits an inference of recklessness as readily as intent to kill. Or "you knew going in you were setting up a situation where someone would be upset if they saw you." *Id.* at 138–39. Again, this speaks as much to recklessness as intent to kill.

Wisconsin's definitions of the two mental states help clarify that overlap. Intent to kill includes awareness that one's conduct is "practically certain" to cause death. Wis. Stat. § 939.23(4). Yet that awareness is also "a species of" the unreasonable and substantial risk

that defines recklessness. *State v. Cox*, 730 N.W.2d 452, 457 (Wis. Ct. App. 2007). Unsurprisingly, some of the same arguments a prosecutor might make supporting reckless homicide might also support an inference of intent to kill. And *Ashe* does not necessarily prohibit the prosecutor from making an otherwise permissible argument simply because the evidence supporting it could also support an offense of which Johnson was previously acquitted. *See Dowling*, 493 U.S. at 348. In sum, the second jury's verdict did not require a finding regarding intent to kill.

### C. The disputed instruction also permitted a finding of intent to cause great bodily harm

Finally, even if the jury rested its verdict on the provocation theory, intent to *kill* differs from the provocation instruction's description of intent to provoke an attack as an excuse to cause death *or great bodily harm*. Wis. Stat. § 939.48(2)(c). At most, the first jury found that Johnson lacked intent to kill, which would preclude the second jury from finding to the contrary. But nothing would prevent the second jury from finding that Johnson provoked the attack as an excuse to cause great bodily harm. Indeed, the trial judge in Johnson's second trial suggested removing "to cause death" from the jury instruction, keeping only to cause great bodily harm. *See* ECF No. 9-17 at 28. Johnson *opposed* this proposed change. Regardless, this demonstrates that the parties, and the judge, recognized that there was a distinction between intent to kill and intent to cause great bodily harm. This provided yet another opportunity for the jury to find guilt, even resting on the provocation instruction, without concluding that Johnson intended to *kill* K.M.

In sum, provocation was not the centerpiece of the prosecution's case in the second trial, and so the jury might not have relied on the challenged instruction at all. And, even if it did find provocation, the jury could have concluded that Johnson possessed intent to cause

great bodily harm rather than intent to kill, which would not be inconsistent with any intent-to-kill conclusion the first jury might have reached.

### V. Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For a certificate of appealability to issue, a petitioner must show that "reasonable jurists" would find this court's "assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, although the petitioner's argument properly grounds itself in *Ashe* and the Double Jeopardy Clause, I have concluded above that his argument fails for two reasons: that the first jury did not necessarily decide intent to kill in his favor, and, even if it did, the second jury did not necessarily reach a contrary conclusion. Therefore, I will deny a certificate of appealability.

## CONCLUSION

For the reasons stated above, the court **DENIES** the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 by a person in state custody, ECF No. 1; and **DISMISSES** this action. The court **DENIES** the petitioner a certificate of appealability. The clerk of court shall enter judgment denying the petition and dismissing this action.

**SO ORDERED** this 9th day of November, 2026.

STEPHEN C. DRIES
United States Magistrate Judge